2021 IL App (1st) 181975-U

THIRD DIVISION
November 17, 2021

No. 1-18-1975

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) ) | Appeal from the Circuit Court of |
| Respondent-Appellee | ) ) | Cook County |
| v. | ) ) | No. 11 CR 17148/02 |
| SAMUEL ELAM, a.k.a. ADONIS ELAM | ) ) | Hon. James B. Linn, Judge Presiding |
| Petitioner-Appellant | ) | |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*: Affirmed. Trial counsel was not ineffective for pursuing only viable trial strategy after his client offered him two alternative theories which relied upon unsubstantiated evidence.

¶ 2   On September 27, 2011, armed men stormed into a house on the 400 block of West 116th Street in Chicago. They rounded up the occupants and brutally beat one man with their guns and robbed him. The petitioner here, Samuel (a.k.a. Adonis) Elam, was there, and police arrested him. He was convicted for being one of the assailants but claimed he was actually a victim.

¶ 3   At a bench trial, the court found Elam guilty of home invasion and robbery and

sentenced him to serve 30 years in prison. We affirmed (*People v. Elam*, 2016 IL App (1st) 140228-U), and Elam filed a postconviction petition, claiming ineffective assistance of trial counsel. After a third-stage evidentiary hearing where Elam, two potential exculpatory witnesses, and Elam's trial counsel testified, the court denied the petition.

¶ 4    Elam appeals, arguing his trial counsel was deficient because counsel's case theory that Elam was outside the house and randomly brought in it by police after the incident was a "total, made-up lie." But counsel pursued the only valid trial theory he could without presenting what may have been perjured evidence, and the witness whom Elam believes could have exonerated him was not credible. Finding more reasons to commend counsel than condemn him, we affirm.

¶ 5                                    BACKGROUND

¶ 6    Our order affirming petitioner's conviction on direct appeal provides an extensive discussion of the evidence at petitioner's trial, and we incorporate it here. *Id.* ¶¶ 3-21. We summarize what is necessary to address his current appeal.

¶ 7    The following facts come from petitioner's bench trial. In the defense's opening statement at the bench trial, Charles Ingles, counsel for petitioner, told the trial court there would be a "lack of evidence" of petitioner's guilt, and the State could not meet its burden to prove that guilt beyond a reasonable doubt. Ingles argued evidence would show his client was brought into the house by police after the incident occurred.

¶ 8    Various witnesses testified that, on September 27, 2011, petitioner, along with several others, entered a two-flat apartment on West 116th Street armed with guns. They rounded up Dante Young, Theresa Harper, and the other residents of the building, and beat and took items from Rubin Bridges, who also lived there.

¶ 9    Young, who lived in the first-floor apartment, said he was outside when three masked,

armed men approached him and told him to get into the house. Young tried to close the door, but the men were able to force it open and get inside. The men hit Young several times in the head and forced him to strip naked and get on the floor. About 30 minutes later, Bridges, who lived on the second floor, came home. The men grabbed him and began to beat him with their pistols. After the incident, Young identified petitioner in a lineup as being in the house. Young did not know him, and petitioner did not live in the building.

¶ 10    Theresa Harper, who was Bridges's girlfriend, testified she was upstairs in the second-floor apartment when she heard some commotion downstairs. A heavyset man kicked open the door of her bedroom, took her downstairs, and made her sit in the corner of the foyer. Three men, one of them petitioner, was on the first floor armed with guns. The men asked Harper repeatedly where the "shit" was, during which time petitioner and the other men pulled their bandanas down to speak, allowing Harper to see their faces. Harper identified petitioner in a lineup and at trial as one of the men who spoke to her when she was taken to the first floor of the building.

¶ 11    Rubin Bridges testified that he came home around 11:30 p.m. When he opened the door, one of the men snatched him and brought him inside. Petitioner and another man then beat him with their guns. Petitioner told Bridges to give up his keys, and he complied. Bridges eventually passed out from the beating but woke up when one of the men sprayed Windex in his face. At some point, petitioner and one of the other men dragged Bridges upstairs, beat him some more, and demanded to know where "it" was at. Bridges passed out again and did not regain consciousness until after police arrived.

¶ 12    Bridges said that, after petitioner was arrested, petitioner's father "kept coming around" asking Bridges to "throw it out." He said petitioner's father, Adonis Elam, eventually paid Bridges' $50 cell phone bill, and Bridges informed police of Adonis Elam's efforts to get him to

drop the charges against his son. Bridges also said he was approached by some guys on the street who told him to "let it go," as in, drop the charges and not come to court. Bridges believed the men were acting on behalf of petitioner and his codefendants.

¶ 13    Chicago Police Officer Admiral Romero testified that he responded to the house on West 116th Street the night of September 27, 2011. When he and his partner arrived, they went into the house and were directed upstairs. There, they found Bridges bleeding profusely from his head. Romero then found petitioner and a codefendant in a bathroom and arrested them.

¶ 14    The trial court found defendant guilty of multiple counts of home invasion, residential burglary, and armed robbery, and sentenced defendant to a total of 30 years in prison.

¶ 15    In his direct appeal, petitioner claimed the State failed to prove his guilt of armed robbery beyond a reasonable doubt, and his sentence was excessive. We affirmed his conviction and sentence. *Elam*, 2016 IL App (1st) 140228-U, ¶ 39.

¶ 16    In September 2016, with the assistance of counsel, petitioner filed a postconviction petition, alleging various allegations of trial and appellate counsel's ineffectiveness and actual innocence. To support his actual innocence claim, petitioner included affidavits from Cherese Rodgers and Dessie Brumfield. Rodgers swore that petitioner was with her in the house on West 116th Street on September 27, 2011, before the home invasion and robbery. Rodgers said when the armed men came, they took Rodgers and petitioner and put them with the other occupants of the apartment. When police arrived, they arrested petitioner because he matched the description of one of the robbers. Rodgers also swore that she contacted petitioner's counsel, Ingles, before trial, but Ingles refused to allow her to testify.

¶ 17    Brumfield swore in her affidavit that she saw three men armed with handguns, none of whom were petitioner, enter the house with Young. She saw petitioner enter the house earlier in

the evening with Rodgers.

¶ 18    The court docketed the petition, and the State moved to dismiss. Finding a factual conflict between petitioner's allegations and the trial record, the court held an evidentiary hearing into the petition's claims.

¶ 19    At the evidentiary hearing, Rodgers, Brumfield, and petitioner testified on his behalf. Rodgers said that she knew petitioner because she often bought marijuana from him. On September 27, 2011, petitioner came the house at West 116th Street, where she was living, to bring some drugs and "spend some time together." Petitioner stayed at the house for several hours. At around 9 o'clock that night, masked men barged in and ordered everyone, including petitioner, to get on the floor. Rodgers believed the men were looking for crack cocaine because Bridges sold it out of the house.

¶ 20    Rodgers said she went to the police station that night and told investigators that petitioner was not one of the offenders. And prior to petitioner's trial, she spoke to petitioner's attorney and investigator. The attorney (Rodgers could not remember his name) told her he would call her as a witness, but when she went to court in 2013, that attorney told her she wasn't going to testify.

¶ 21    On cross, Rodgers admitted that she was drunk and high on September 27, 2011, having smoked marijuana and crack. Rodgers also said that although she was listed as a victim in the case, she did not talk to anyone with the State's Attorney's Office before trial, even though the State's Attorney tried to reach out to her. She also never told the State's Attorney before trial that petitioner was not one of the masked invaders.

¶ 22    In February 2016, Rodgers said petitioner's father approached her, and she signed a handwritten document detailing her recollection at his request. A few months later, in September and then again November, Rodgers signed a typewritten affidavit, in which she claimed

petitioner was with her the night of the incident and was not one of the offenders.

¶ 23    The State impeached Rodgers with testimony that, in February 2018, after she had signed that affidavit, Rodgers spoke with an investigator from the State's Attorney's Office while she was in police custody in Chicago. She admitted she told the investigator that she did not know petitioner, barely remembered what happened the night of the home invasion and robbery because she was high on crack cocaine and did not remember being contacted to come to court to petitioner's case.

¶ 24    Petitioner testified that, on September 27, 2011, he lived in Memphis but was visiting family in Chicago. He knew Rodgers since 2010 because he frequently sold her marijuana, and they met that afternoon at a gas station. She told him to come by her house later in the day because she wanted to buy some marijuana.

¶ 25    Petitioner went to the house on West 116th Street sometime between 7 and 8 p.m. He knew it well because it was a "trap house," a place where people went to buy and sell drugs. When he got there, he went to Rodgers's room at the back of the house, where he stayed until the masked men came a few hours later. The men went into Rodgers's room, forced him and her out, and made him lie on the floor. There were four or five men, all with guns, and when Ruben Bridges (whom petitioner said he knew) came through the front door, they grabbed him and took him upstairs. About five to 10 minutes later, petitioner heard sirens and saw lights, and the men ran out the back door. When the police were on scene, they made everyone in the house lie back down on the ground again, petitioner testified. One of the officers picked him up, put him in handcuffs, walked him out the front door, and put him in a police car.

¶ 26    Petitioner said that a month or two later, Ingles began representing petitioner in this case. They would often speak in the "bullpen" before court appearances, and Ingles visited petitioner

once in jail before trial. Petitioner testified that he told Ingles he was a guest at the house after Rodgers had invited him and encouraged Ingles to speak with her. However, Ingles told petitioner that he did contact Rodgers and determined he did not want to put her on the stand because she would testify that petitioner was at the house to sell drugs. According to petitioner, Ingles did not want the judge to know petitioner was there and said the judge would instead see through the flaws in the case without Rodgers's testimony. Ingles believed, petitioner said, that only one person would identify him even though she only saw his eyes, and that her identification was so weak it would not implicate him in the crime. Instead, Ingles told petitioner they would go with the theory that the police arrested him outside the house by accident, then walked him in. Petitioner admitted he went along with counsel's strategy at trial.

¶ 27    Petitioner also called Dessie Brumfield to testify at the hearing. In September 2011, Brumfield lived four or five blocks west of the house on West 116th Street. On September 27, 2011, sometime between 10 and 10:30 p.m., she went to the house to buy drugs and saw petitioner on the porch, smoking a blunt with Rodgers. Brumfield bought drugs and left but came back an hour later to buy more cocaine and heroin from Ruben Bridges. When she was talking with a man named Mickey across the street, she saw an unknown man at the porch of the house finish smoking a cigarette, then go back inside. Then, Brumfield saw two men, one of whom was Young, outside the house with Bridges. Brumfield left shortly thereafter, and she did not see anything else. Brumfield admitted she did not speak to anyone in 2011 but did write out a statement in 2016 about what she saw when petitioner's father approached her. Brumfield admitted she was using drugs when she testified.

¶ 28    After petitioner rested, the State called Ingles to the stand. Ingles testified that he had previously represented petitioner, so he knew him before being hired to represent him on this

case. Ingles worked with Wayne Bunch, an investigator, whom Ingles had interview potential witnesses. Ingles said he met often with petitioner's father, who helped search for people to interview. Ingles said he and Bunch did not try to question Rodgers because, according to the police reports, Rodgers did not identify anyone at the house. Ingles said he did not have any indication Rodgers would provide relevant testimony, either for or against petitioner, so he did not think it was important to question her before trial. Petitioner never told Ingles to interview Rodgers or that she was a potential witness, and Rodgers never contacted Ingles to tell him her side of the story.

¶ 29    Ingles said that, before the trial, he met with petitioner to discuss a potential strategy for his trial. During one of these meetings, petitioner told Ingles that the night he was arrested, he was walking on the street with another person near the house on West 116th Street. As they got close to the house, police pulled up, grabbed him, and took him inside. Petitioner told Ingles that the person with him that night could substantiate that alibi.

¶ 30    Petitioner's father eventually brought that potential witness to Ingles's office, where Ingles interviewed him. Though Ingles could not remember the potential witness's name at the time of the hearing, Ingles said he asked the witness what he saw the night petitioner was arrested, to which the witness responded, "What do you want me to say?" Ingles again asked the witness to tell him what he was a witness to, but the person kept asking Ingles to tell him what he should say. Ingles then decided that this person did not witness anything, ended the interview, and did not speak with him again.

¶ 31    After his investigation was done, Ingles said he believed the best strategy was to attack the credibility of the State's witnesses. Several witnesses had changed their stories, Ingles said, and only one witness identified petitioner as one of the offenders on the scene. He went over this

strategy with petitioner, who never expressed any disagreement.

¶ 32    Ingles also denied that petitioner ever told him he was Rodgers's guest at the house the night of the incident or that petitioner repeatedly said he was outside the house when police arrested him, then took him inside. However, on cross-examination, Ingles recalled that, sometime before trial, petitioner told Ingles he "could say that I was already there and I was there to buy drugs." Petitioner's story only changed after the potential alibi witness did not pan out, Ingles said, and when it was clear that witness would not be called to testify at the trial.

¶ 33    When asked why he did not pursue a theory that petitioner was inside the house at the time of the invasion, the following exchange occurred between Ingles and petitioner's postconviction counsel:

"Q.  And what is the basis for that? Did he agree to go with the theory that he first told you during the trial?

A.  The basis was that the first story that he came up with was a lie and the second one that he was suggesting was another lie and there was no way to put that on the witness stand and I'm not supporting perjury for him or you or anyone else.

Q.  So your testimony is that you and [petitioner] agreed that the theory of the case would be that he was brought into the house by police? You say it was mutual. Did the two of you agree to that?

A.  That's—No, I'm not saying that. I'm not saying that at all. The theory of the case was that they couldn't prove their case beyond a reasonable doubt. He didn't have an alibi defense one way or the other. Either rendition was a total false, made up lie and I wasn't going to put that on the witness stand and that was

that. And he didn't want to put that on the witness stand either."

¶ 34    Last, the State called Investigator James Stewart to testify. Stewart said he interviewed Rodgers in December 2017 at the police station at 111th Street. She told him she did not know petitioner and could not recognize a photograph of him. She said she did not remember signing an affidavit for his postconviction counsel, and she was not with anyone on the night of September 27, 2011.

¶ 35    The court denied the petition. In making its ruling, the court acknowledged some disagreement between the potential trial theories but found that Ingles had represented petitioner skillfully under the circumstances. The court observed that Ingles had some suspicion his client may have been trying to manipulate the proceedings by giving him different stories at different times, but Ingles represented him vigorously nonetheless. Finding nothing wrong with Ingles's representation, the court denied the petition. Petitioner now appeals.

¶ 36                                    ANALYSIS

¶ 37    The Post-Conviction Hearing Act allows incarcerated prisoners to challenge their convictions on the grounds that they resulted from a substantial violation of their rights under the U.S. or Illinois constitutions. 725 ILCS 5-122 *et seq.* (West 2016). A petition contains three distinct stages. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). The petition here advanced to the third stage, meaning the circuit court first found that the allegations, taken as true, showed not only the "gist" of a constitutional claim but a substantial showing of one. See *id*.; 725 ILCS 5/122-6 (West 2016).

¶ 38    At the third stage, unlike the earlier ones, the petition's allegations are not presumed true; the petitioner must prove his allegations by a preponderance of the evidence. *People v. Carter*, 2017 IL App (1st) 151297, ¶ 132. If, as here, the circuit court hears live testimony and makes

findings of fact, we will uphold those findings unless they are manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. Manifest error is error so plain and indisputable that the opposite conclusion is clearly evident. *People v. Coleman*, 2013 IL 113307, ¶ 98.

¶ 39 Petitioner's lone contention on appeal is that the court manifestly erred in ruling that his trial counsel provided effective assistance, as guaranteed by the sixth amendment. *People v. Brown*, 2017 IL 121681, ¶ 25; U.S. Const., amend VI. To prove counsel was constitutionally ineffective, petitioner must show his attorney's representation fell below an objective standard of reasonableness, and he was prejudiced by that deficiency. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Failing to make the requisite showing of either deficient performance or prejudice will defeat the claim. *People v. Palmer*, 162 Ill. 2d 465 (1994).

¶ 40 Matters of trial strategy are generally immune from claims of counsel's ineffectiveness, and the petitioner must overcome that strong presumption to prevail. *People v. English*, 403 Ill. App. 3d 121, 135 (2010). In most cases, counsel's trial strategy is "virtually unchallengeable." *Palmer*, 162 Ill. 2d at 476. Counsel has a duty of loyalty and an "overarching duty to advocate the defendant's cause." *Strickland*, 466 U.S. at 688. But that duty is "limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth." *Nix v. Whiteside*, 475 U.S. 157, 166 (1986).

¶ 41 Petitioner claims his trial counsel was ineffective because he relied on a theory that counsel himself believed to be a "false, made-up lie." We cannot accept petitioner's characterization of the representation he received at trial or of counsel's testimony at the postconviction evidentiary hearing.

¶ 42 The trial court credited counsel's testimony that he found himself in the middle of two conflicting stories from defendant, neither of which counsel believed to be true. In one version,

petitioner was outside the house and was dragged in by the police post-event; in the other, petitioner was inside the house but as a victim of the crime, not a perpetrator. Counsel did not believe he could ethically sponsor petitioner's testimony as to either version and thus did not.

¶ 43      Counsel's judgment was eminently reasonable. The first version of the story, that petitioner was outside the house and dragged in afterward by the police, came from petitioner himself, who mentioned to counsel a witness who could substantiate that claim. But that witness proved, in counsel's view, to be anything *but* a credible witness—he simply asked counsel to tell him what to say.

¶ 44      And when counsel informed petitioner of that fact, petitioner immediately abandoned that story and offered a second, dramatically different version, almost as a trial balloon—he could testify that he was *inside* the house, a victim like the others. Yet petitioner, according to counsel, could not identify a single person, among the many inside that house, who would corroborate *that* version of the facts. It would have more than reasonable for counsel to seriously question the credibility of his client and refuse to put him on the witness stand to testify to *either* version.

¶ 45      It was, in fact, the only ethical choice counsel could make. See *Nix*, 475 U.S. at 166 ("Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law."); Ill. S. Ct. Rules of Prof. Conduct R. 3.3(a)(3) (eff. Jan 1, 2010). ("A lawyer shall not knowingly: … offer evidence that the lawyer knows is false."). A defendant, after all, has no right to present false evidence or commit perjury. *Harris v. New York*, 401 U.S. 222, 225 (1971); *People v. Rosenberg*, 213 Ill. 2d 69, 80 (2004).

¶ 46      Instead, as the circuit court noted, rather than embrace either theory, counsel simply "look[ed] at the flaws in the State's case *** on a reasonable doubt theory." We cannot fault

counsel on these facts, as found by the circuit court.

¶ 47     But this is where petitioner's argument comes in: If, in counsel's mind, the theory that petitioner was outside the house while the crime was committed, only to be dragged into the house post-incident by the police, was such a "flat-out lie," why did counsel *pursue* that theory at trial?

¶ 48     Petitioner is correct that counsel raised this topic. In his opening statement at trial, which focused primarily on the State's failure to meet its burden of proof, counsel did predict that the evidence "would show" that petitioner was "brought in by police after the incident occurred." Counsel was referring to Dante Young, who would testify at trial that petitioner was one of the perpetrators (see *supra* ¶ 9), but who allegedly had told defense counsel's investigator before the trial that he did not see petitioner until after the crime was committed. (Recall that a stipulation as to the investigator's testimony regarding Young was admitted at trial.) Counsel also directly questioned Dante Young on that point on cross-examination, though to little avail, as Young insisted that the defense investigator had misunderstood him. And counsel again pointed to Young's statement to the defense investigator in closing argument, prompting the circuit court to question him on that point.

¶ 49     But context is needed. First and foremost, at the postconviction hearing, counsel testified that *he believed* that theory to be a "flat-out lie," based on his privileged conversations with his client and the witness-who-was-not-a-witness. And that was why, consistent with his ethical obligations, he could not and did not put his client on the stand to testify to those facts.

¶ 50     But not suborning perjury is one thing; using whatever evidence is available to help acquit your client, within ethical boundaries, is quite another. Here, for example, counsel did not believe that petitioner was outside the house during the crime and thus would not suborn his

client's perjury. But that did not change the fact that another witness, Dante Young, at least allegedly had made a statement to the defense investigator that petitioner came into the house only after the crime was committed. It was, if nothing else, a prior inconsistent statement compared to Young's trial testimony implicating petitioner in the crime. Counsel would have been remiss *not* to seize on that inconsistent statement, if for no other reason than impeachment.

¶ 51    Yes, as petitioner notes, counsel used this evidence for more than mere impeachment. Counsel did not simply point out that Young said one thing on this day and something different to his investigator on another and thus lacked credibility. Counsel tried to use it for its *truth*, telling the court in both opening and closing that Young's prior statement placed petitioner outside the house, not inside, when the crime was committed. Whether going that far with Young's prior statement was the wisest tactic might be debatable, but it does not strike us as unreasonable for a defense attorney, trying to dismantle the State's case, to poke holes wherever he could, even if briefly toward an alibi theory based on a witness's prior statement.

¶ 52    In any event, a defendant is not entitled to flawless representation; "a mistake in trial strategy or an error in judgment by defense counsel will not alone render representation constitutionally defective." *People v. Peterson*, 2017 IL 120331, ¶ 80. " 'Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found.' " *Id*. (quoting *People v. Perry*, 224 Ill. 2d 312, 355 (2007)).

¶ 53    Here, counsel *might* have stretched his credibility too thin by asking the trial court to believe Dante Young's statement to the defense investigator, but we are quibbling at the margins. Counsel considered his defense to be one primarily of reasonable doubt, not alibi, and the circuit court (who also presided over petitioner's trial) agreed. The record supports the finding that the

overriding emphasis of counsel's opening statement, closing argument, and cross-examinations was to attack the credibility of the State's witnesses—that is, to establish reasonable doubt, not to offer an alibi defense. None of the points made by the defense to that end were negated by the brief discussion of Young's alibi testimony. We cannot find that counsel failed to subject the State's proof to meaningful adversarial challenge. He certainly did so.

¶ 54    In the end, counsel had to straddle a line between not suborning testimony he believed would be perjurious, on the one hand, and using whatever other evidence was available to him to establish reasonable doubt, on the other. The record shows, at a minimum, that he did so competently and ethically, as the trial court found. The circuit court did not manifestly err in finding that petitioner failed to establish deficient performance. So we need not consider the prejudice prong; the ineffectiveness claim fails. *Palmer*, 162 Ill. 2d at 465.

¶ 55    Lastly, and only in his reply, petitioner claims the court ignored Brumfield entirely and erred because her testimony "went right to the gist of petitioner's position" that "he was not one of the [offenders] who invaded the premises." But Brumfield's testimony appears wholly unrelated to petitioner's ineffective assistance claim, except possibly insofar as we might consider the question of prejudice. As we have disposed of the ineffectiveness claim based on the deficient-performance prong alone, we have no need to consider prejudice. In any event, this argument was raised for the first time in the reply brief, providing the State no opportunity to respond, and thus petitioner has forfeited it. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *BAC Home Loans Servicing, LP v. Mitchell*, 2014 IL 116311, ¶ 22.

¶ 56                                    CONCLUSION

¶ 57    The judgment of the circuit court is affirmed.

¶ 58    Affirmed.